Next case in the morning is People of the State of Illinois v. Mark Winchester, 414-0781, for the Office of the Court of Arms, for the afternoon. Ms. Wyckoff, you may proceed. Good morning, Your Honors. May it please the Court and my colleagues from the State. My name is Ian Barnes from the Office of the State Appellate Defender, on behalf of Mr. Winchester. Mr. Winchester has raised two primary arguments in his brief before this Court. The first, that he was seized unconstitutionally in violation of his Fourth Amendment rights, and the second, that his sentence was the product of an impermissible double enhancement. I'd like to focus solely on the Fourth Amendment issue, unless Your Honors have questions about the sentencing argument. On July 2, 2013, Mr. Winchester was subject to an unconstitutional seizure, when he was followed for over a mile by a University of Illinois police officer. Was that improper? That was not, no. Why do you mention it? Because it factors in the totality of the circumstances later down the road. You mean it became improper later? It did, yes. Why? The seizure itself? No, why was it improper to follow? It wasn't improper to follow him, but it's part of the totality of the circumstances that feeds into whether the seizure was reasonable later. Okay, go ahead. Mr. Winchester was followed for over a mile. He committed no traffic violations, no other crimes. He parked in a parking lot and turned off his vehicle without issue. And the officer waited in an adjacent parking lot and watched him for five minutes before approaching the vehicle. Eventually, he asked Mr. Winchester to open the door to his vehicle. Was it improper for him to approach the vehicle? No, it wasn't. Asking him to open his door was. And just to begin with, through its brief, the state has conceded that this encounter was a seizure by embracing the community caretaking doctrine. Because community caretaking is a seizure. Lloydeman and McDonough both tell us that community caretaking is an exception to the warrant requirement of the Fourth Amendment. It is used to validate searches and seizures that are wanting for probable cause or reasonable solution. And so the only issue this Court need decide is whether that seizure was reasonable. And, of course, I would submit that it was not. It was not reasonable in the community caretaking doctrine because it was not divorced from criminal investigation. And it was not reasonable to protect the safety of the general public. What part of a police officer's actions are divorced from criminal investigation? Community caretaking, Your Honor, such as. Well, I mean, community caretaking may be what is the motive, but a police officer is always a police officer. A police officer is called to the scene of an accident. He is to try to assist people who might be injured. But isn't he always supposed to be on the lookout to see what else might be there, like whether there's contraband in the car, whether someone might have evidence of having been driving drunk? Your Honor, I would disagree with that on the point that while he is supposed to be on the lookout, community caretaking is by definition, according to the U.S. Supreme Court, divorced from criminal activity. And that is assisting people on the side of the road who might have broken down. So while they might stumble upon criminal activity, the seizure itself, when it begins, must be done purely out of the interest of. So when he comes to the car and he knocks on the window, that should be to find out if there's some problem? That's right. He approaches the window. Is there any reason to think that wasn't the case here? Well, he never says that he approached the car to find out whether the driver was okay. He expresses. Is he required to say that? He's not required to say that. But when we're talking about the totality of the circumstances. Isn't the focus supposed to be on the objective circumstances presented to the officer as opposed to his subjective intent? That's exactly right, Your Honor. Okay. So what are the objective circumstances leading to his walking up to the window and knocking? Well, at the point he walks up to the window, circumstances are he followed Mr. Winchester home and watched him park in a parking lot without issue, turn the car off, and not exit the car for five minutes. He didn't mention. What does he see when he approaches the car? Once he's up to the driver's side window, he sees that Mr. Winchester is asleep in the vehicle. And he knocks on the window. Asleep in what way? He says he's, I don't remember the exact words, but he says he's sort of slouched over on one side. He's got keys in one hand and some sort of bottle of tea in the other. And his expression. So your position, pausing right there, having seen that, the appropriate thing for the officer to do is walk away. No, Your Honor. That's not my position. So what did he do that he knocked on the window? The seizure was asking him to open his door. He knocks on the window and says, according to his trial testimony, it took about 30 seconds for Mr. Winchester to wake up. And at that point, Mr. Winchester extends his middle finger and says, no, Felicia. Or if we were to believe Officer Snow's trial testimony, Mr. Winchester's statement is more emphatic. And he says, I beg Your Honor's pardon, fuck you, no, Felicia. And at that point, any concern about Mr. Winchester's health was dispelled. Why? Because he was awake. He wasn't injured. He wasn't in any signs of distress. There was no damage to the car. Did he sit up in the car? No, he didn't. So he's still slouching over the driver's, over to the passenger's side when he says that? Yes, that's right. Okay. Did the officer know this person before? Know him personally? Yes. No. Know what his medical history might have been? No, Your Honor. Okay. Why should the officer have ruled out immediately that there's any kind of medical issue present there? Well, there's two reasons. The first is that, and this goes back to Your Honor's very first question, everything that he'd seen up to that point should inform his concern. This isn't People v. Robinson, which we cited in our brief, where an officer was called to the scene, there was a car running on the side of the road, and the driver was asleep, and no one knew how long the car had been there. No one knew quite what the situation was. The car was running, so it indicates there was a problem. People don't just fall asleep at the wheel with the car still running, versus Mr. Winchester's case where the officer knew exactly how long he'd been there because he'd followed him all the way home and then watched him for five minutes. You didn't mention that it was 1.15 in the morning. Does that matter? No, I don't think it does. If anything, it simply feeds into the idea that he was just asleep. But on top of that. Well, my question is how is the officer supposed to rule out, that's really the phrase, isn't it, any medical issue at this point concerning Mr. Winchester? When he sees him, how, without knowing him or without knowing his medical history, how could he rule out that this is perhaps insulin shock or some other medical issue which is going on, which accounts for his driving strangely, according to the officer, and then at 1.15 in the morning pulling into a parking lot and then slouching over? Two things, Your Honor. First, I would disagree that he was driving strangely. Well, that's what the officer thought, wasn't it? The officer says that when he passed him on Kirby Avenue, he noticed he looked focused extremely hard on driving, and that was for whatever instant that was when they crossed paths. Is that believable? I'm sorry, is what believable, Your Honor? What the officer said. It's believable, yes. Is it any reason why the court shouldn't accept the officer's assessment and that would be driving strangely? Okay, so he sees him driving strangely, pulls into a parking lot, doesn't get out, slumps over. He walks over to the car. How is that a basis to rule out a medical emergency or a problem of some kind? Well, the first fact, and one that the State has addressed in its brief but hasn't really discussed in great depth, but I think it's incredibly important, is what Mr. Winchester says when he's awake. He says emphatically and admittedly very colorfully, no thank you, please go away. He didn't say that. He just said no police, or fuck you, no police, or words without effect. That's right. Okay, so how does that rule out the insulin shock or some other medical emergency that would be a reflection of odd behavior in that position? Well, I would also just disagree that it was odd behavior, but on top of that... In his eyes, it appeared to be odd behavior. Certainly as an objective person myself, I view it as odd behavior. How does it rule out a medical emergency? Because when we're talking about community caretaking, as McDonough says, the purpose of community caretaking is to assist the public, is to help people in need. Tony LaRusso, when he was the manager of the Cardinals, fell asleep at the wheel with the car running in Florida at spring training. Police officers approached his car to check on his well-being. Thereafter, he was arrested for driving under the influence. I don't know what he did in terms of did he plead guilty, did he file a motion to suppress, but if I were a private citizen in that parking lot, and I had parked closer to him, perhaps, and I saw him slump over, I'd go over to the car to see what his issue was. I might have reacted differently when I knocked on the window to check on him if he had sworn in. But I probably would have checked on him. And I might have still said, you know, man, are you okay? I guess I don't understand what police officers are supposed to do in those circumstances. Well, that's a fair point, Your Honor, but the distinction is you would be a private citizen acting. Well, yeah, but what is it? You know, I'm layering it with my experience or my thought as a private citizen, but what is it that we would expect a police officer to do? Taking into account, he may hope the guy is intoxicated. He may hope that subjectively, but objectively, he's showing concern for a citizen. Well, there's a couple points in response to that, Your Honor. The first is, objectively, I don't think all of his actions demonstrate that he was genuinely concerned. I think his actions demonstrate that he was fishing for activity, and the concern expressed was the pretext. That was what got his foot in the door, literally. I guess not literally, he didn't literally put his foot in the door. But when the United States Supreme Court says that the touchstone of Fourth Amendment analysis is reasonableness, and when we're talking about reasonableness, we're balancing the government interest versus invading the privacy and security of a private individual. And when we're talking about community caretaking, and the government interest is assisting the public, and you have an individual who says, thank you, but they don't want assistance, or something a little more brusque, the government interest is no longer there. Let me ask you for the third time, Mr. Barnes, see if you can give me an answer. What is there about the circumstances as the police officer encountered them, after the colorful remark of Mr. Winchester, that permitted the police officer to rule out any medical emergency? Respectfully, Your Honor, I don't think the standard is whether he can rule it out. It's whether it's reasonable. Well, then, just stopping right there, why wouldn't the reasonableness of the police officer's action depend on whether it can rule out a medical emergency? And if he can't rule it out, then it's entirely reasonable for him to say, open the door. Because nothing about the encounter, aside from the fact that he took a period of time to wake up, indicated that there was any emergency. There was no other issue. He wasn't having a stroke. How does he know that? How does he know? I mentioned insulin shock. Wouldn't that, from a layman's point of view, wouldn't that be consistent with what was going on at this point, from what the officer could see? A disoriented person acting strangely and having trouble waking up, how would he know that from outside the window, to say that couldn't be it? But, see, he walks away and the guy dies in the car because of insulin shock. Wouldn't the idea be, gee, why didn't you stop and say and check this out further? That concern isn't consistent with everything else that the officer had witnessed. Because if we're talking about someone in insulin shock, that doesn't make sense in the context of him being able to drive home, break no laws, no swerving, no anything of that sort, and that suddenly, as soon as he parks in that parking space without issue, that's the exact moment he has an emergency. I don't know that. I like to think I'm as reasonably informed as the next guy, but I don't know that insulin shock comes on that suddenly, that it wouldn't account for, remember this is what I said, he was driving strangely for this last mile or however it was, according to the officer, which would suggest that whatever this condition was, maybe this was something that was leading up to it. You're saying insulin shock comes on like that. I don't know that you know that or that that's common medical knowledge. Maybe this is some other medical condition that counts for it. How would the officer know? Because all he has to go on is the objective circumstances in front of him. Do those permit him to rule out any medical emergency? That continues to be my question. You say yes, but I want to know why. My answer is that's not the standard. If we say it is the standard, do you lose? That might very well be so, but respectfully that's not the standard. So I'm judging his reasonableness. He's encountered someone. He thinks the objective, I don't know if he thinks it, but the objective he might have a medical emergency presented to him. The reasonableness of the police officer's behavior, it seems, would be judged on all these issues, and one of them would be can he rule out a medical emergency, and you've given me no reason to think that he could rule out a medical emergency. If there is something, I want you to tell me. Respectfully, Your Honor, the reason he could rule it out was because Mr. Winchester was awake. He was aware there was an officer standing there, and he suggested to him, I don't desire your presence. And what I think, Your Honor— He didn't sit up, did he? No. That was the question you asked. Well, that would be a sign of disorientation still, would it not? I mean, cop knocks on your window, and you're just falling asleep. You'd express what one would expect that, oh, I'm going to sit up and back down. Yeah, I just was asleep or worse to that effect. But if he's still slouched over into the passenger seat, maybe he's having a problem and he can't sit up. Why wouldn't that be a reasonable thought on the police officer's part? Because Mr. Winchester had the wherewithal and the presence of mind to know this was a police officer and to say, I don't want you here. And regardless of whether the officer thinks there's an emergency, we're still talking about this individual's right to privacy and security, and the purpose of community caretaking is to assist him. But if he doesn't want that assistance, then there's no reason to say the officer can force himself on that person and say, I must assist you, even though Mr. Winchester is saying, I don't want your help, I don't want your presence, I don't want to speak to you. But on top of that, Your Honor, there's any number of reasons. He could have not sat up straight and decided to acknowledge the officer directly to his face. He's a private citizen. He doesn't have to. Well, the question isn't does he have to. The question is, is he medically capable of doing it? And the expectation would be, from the officer's point of view, certainly mine, under those circumstances, he'd sit up and he did it. Does that mean that he chose not to or that he was having a medical problem? Isn't that a legitimate concern for the officer or a legitimate thought? Respectfully, I would disagree with that, simply because him saying, I don't want you here, eliminates that Fourth Amendment interest in community caretaking, which is divorced from criminal activity and solely for the purpose of helping him. If the officer sets out to help someone and the person says, I don't want your help, the government no longer has any interest in that interaction. And at bottom, what the Fourth Amendment guards against is arbitrary intrusions. And if a citizen says, I don't desire your presence, and we're talking about community caretaking, that invasion is now arbitrary. There's no purpose for it if the individual doesn't want or require assistance. So respectfully, Your Honor, in the totality of the circumstances, following Mr. Winchester home, and I would also respectfully disagree with you. Suppose this is a motel, and the police officer is there for another reason. And he walks into the reception area, and he sees a fellow sitting in a chair with his car keys in his hand, slumped over. And he walks over and nudges the guy. And the guy looks up, gives him the finger, and says, fuck you, no police here. Would the officer be entitled to say, sir, are you getting ready to drive? Do you need help to your room? Would that be community caretaking, or would that be maybe you shouldn't drive, or do you need help to your room, or should I talk to the motel clerk? What would that be? I certainly think an officer is entitled to ask those questions. It would be reasonable to approach him. Yes, but the distinction there is he doesn't know how long the guy's been there, and he hasn't witnessed his behavior in the preceding 10, 15 minutes where there weren't any issues that would arouse suspicion or concern. What's the suspicion or the concern about sleeping in a hotel lobby? In a chair, just sitting kind of slumped over. Well, there isn't one. Would it be reasonable to approach him? Yes, but that's the distinction between your hypothetical and this case. So in my hypothetical, it's the goodness of the officer's heart. In this case, you're worried about his subjective suspicions. Respectfully, I don't think I'm worried about his subjective suspicions. Well, you're saying he is trying to investigate what he thinks is criminal activity rather than doing community caretaking. In Mr. Winchester's case? Yes. I would say his actions up to the point where he asked Mr. Winchester to open the door demonstrate that he was fishing for criminal activity. He followed him for over a mile, he observed no criminal violations, and yet still pulled into an adjacent parking lot and watched him for five minutes. His stated concern was when he gets out of the vehicle, when I saw nobody exit the vehicle, I decided to wait and see why that person would not exit their vehicle after parking in an area like that. He doesn't say he was concerned. He just says he was curious. And to return to our basic Fourth Amendment principles, that's arbitrary. That's curiosity, and the Fourth Amendment does not count as curiosity. Thank you. Fourth Amendment does not count as curiosity. Thank you. May it please the Court and Counsel? Your Honors, the State agrees that there are two fundamental concepts that control this case. One, whether the officer's actions were reasonable, and two, the totality of the circumstances in this case. However, the State disagrees that the totality of the circumstances demonstrated that the officer's actions were unreasonable or that he had some sort of motive at arresting this man for DUI that night. If I may, I would like to present what the State believes are the totality of the circumstances in this case. At about 1.20 in the morning, Officer Ryan Snow observed the defendant driving lawfully. He testified that he was driving lawfully near the U of I campus. He observed the driver leaning forward over the steering wheel, focused extremely hard on the task of driving. Officer Snow did not begin to follow the defendant at that time. He made that observation, thought it was a bit strange. Officer Snow observed the vehicle again shortly thereafter, and at that time he followed the vehicle, which is perfectly lawful for an officer to do. Officer Snow observed the vehicle driving a bit, again testified that the vehicle was driving lawfully. There was never a dispute as to whether the vehicle was lawfully driving or not. The vehicle turned into a parking lot, and Officer Snow turned into an adjacent parking lot. Officer Snow testified that he turned into that parking lot intending to simply go around the lot and exit it, but he noticed that when the vehicle parked in its own parking lot, no one ever got out of the car. And at this point, I'd like to encourage your honors to bear in mind that it's 1.30 in the morning on a college campus. As has been discussed earlier, there could be any number of reasons why someone wouldn't exit their vehicle in the middle of the night. Perhaps there was a medical emergency. One reason might be what a lot of people do, particularly when you're waiting for the parking spot, is that they sit there and look at their cell phone. Correct. That's correct, your honor. And I know that that was something that was suggested by the defendant in his brief. I submit to your honor, again continuing with the totality of the circumstances in this case, after about five minutes when no one exited the vehicle, Officer Snow approached. He didn't see someone tinkering around on their cell phone, talking on their cell phone. Perhaps his favorite song was on the radio, listening to that song in the car. That's not what he saw. In plain view, he saw the defendant slumped over, passed out in his car. But not only that, when he approached the vehicle, he saw a man passed out, the keys to the car in one hand and a bottle of tea in the other hand. As was suggested by Justice Steigman, maybe he was having some sort of diabetic problem, an insulin issue. Perhaps he, before Officer Snow even approached the car, perhaps it was a situation, again a college campus, where someone's hesitant to walk back to their apartment by themselves in the middle of the night. There's any number of things that could be going on. Does the record show whether or not the officer saw that he was slumped over before he got to the car? Yes, the officer testified that during the motion to suppress hearing, he approached the vehicle. As he approached, he saw that the defendant was slumped over, passed out in the car. Upon coming up to the window of the vehicle, he then saw the keys and the bottle of tea. And your honors, the state thinks that fact is very important in and of itself. Not only is he passed out in the car, he still has the keys to the car in his hand. At that time, Officer Snow attempted to wake him up, bang on the window, no response. He calls in for backup. And he said that he was concerned at that time there was a medical emergency. This man is passed out. He won't wake up in his vehicle. Thirty seconds, of course, in hindsight, doesn't sound like that long. But when you're there in that moment, under the totality of the circumstances, considering whether this officer acted reasonably. What's 30 seconds? What are you referring to? There is some discussion here today how long was he banging on the window. I think the record demonstrated it was about 30 seconds before the defendant woke up. I suggest, your honors, in the heat of the moment when this is happening, that's kind of a long time to wake somebody up. At that time, then, the defendant, still slumped over, makes an obscene gesture that I won't make in front of your honors today, essentially tells the officer, F-you, no policia. At which point, Officer Snow, and he's still slumped over, he's not sitting up acting normally, says, hey, can you open the door? There is some discussion, Justice Connect suggested, when you see something like this, isn't it anyone, including a police officer's first instinct to say, hey, are you all right? You know, what's going on here? But once the defendant began to stir, made that obscene gesture, and opened the vehicle, the odor of alcohol emitted from that vehicle. Mr. Burns argues that the obscene gesture in the statement to the police officer was enough to essentially say, I'm okay, leave me alone. Why isn't he right? Yes, the state disagrees with that. Because he's still slumped over in the car, there's no indication that he's okay at that time. Yes, he says something not very nice, and tells the officer to essentially get lost. But that doesn't indicate that he's okay, that there's not a problem. And again, under the totality of the circumstances, the state takes quite the opposite stance as defendant. But the fact that the officer had observed him for approximately ten minutes or so leading up to this incident, that gave him even more reason to be concerned about the welfare of this person and the welfare of the general public. He saw the defendant acting strangely while he was initially driving toward the U of I campus. So the officer was already on notice that something maybe is wrong with this person, there's something not quite right with this person. So the state contends that even though the defendant said no policia and gave him the finger, he wasn't alert, he wasn't acting like he was okay. The officer still had every reason to have concern for the welfare of this person. Does the record show what the officer said when he called for backup or medical assistance? No, the officer testified that he called for backup when he approached the vehicle, started to try to wake the defendant up, to no avail, called for backup at that time. Well, I want to make sure I understand. The sequence is according to his testimony. He backed in the window and tried to wake him up and got no response, then called for backup? I believe it was my understanding of the record that he called for backup sort of while in the process of trying to wake up the defendant. His microphone was not on at that time, so there's not exact audio. His radio, you mean, or what do you mean his microphone? He had like a cam, so it didn't catch sort of this early interaction with the defendant, but the DUI investigation was captured. So exactly at what exact moment he called for backup is not totally clear. I'm not being clear. Did he call for backup as he approached the car or after he got to the car? My understanding was that he got to the car, saw the defendant slumped over, couldn't wake him immediately, called for backup, kept trying to wake him up. And the call for backup, was that a call for medical assistance or a backup officer? A call for a backup officer. Your Honors, the state believes that this officer did exceptional police work in this case. He observed the defendant driving lawfully, but he could sense that perhaps something was not quite right when he initially saw the defendant driving and focusing extremely hard on the task of driving. He didn't stop the defendant at that time. There's no Terry problem here. He then saw the defendant again, continued to drive, followed him. That's fine. He can follow him. And then when he observed that he never got out of the vehicle, that's when he went to go make contact with the vehicle. And I'd like to just quickly go back to something that was discussed earlier with my opposing counsel. What is he supposed to do when he sees someone passed out in their car? Walk away? What if there was a medical emergency? He could have died in the car, and then what? Your Honors, this officer acted in a perfectly reasonable manner under the totality of the circumstances. It's the middle of the night on a college campus. You've already seen this guy exhibiting some odd behavior. Your Honors, we ask that this court affirm the officer's actions and find that the evidence was properly suppressed by the trial court. Just briefly, Your Honors, another issue that was raised by the defendant was whether he was properly sentenced in this case. The state contends that there is no double enhancement problem. The defendant himself during his sentencing hearing asked for a term of probation. This was his third DUI, so the two prior DUIs were inherent in that offense itself. The defendant asked for a sentence of probation. The trial court discussed the defendant's two prior DUI offenses. Not as aggravating factors, but to explain to the defendant why you're not going to get probation today. Unless Your Honors have any other questions, the state asks that you affirm both defendant's sentence and his conviction. At the hearing and the motion to suppress, the only witness to testify was the officer? Yes, that's correct, Your Honor. Did the trial court make any reference to the fact that this was entitled a bogus motion to quash arrest? Your Honor, not that I recall, at least not in those expressed terms. I know that the trial court ended up discussing sort of, there was some talk whether this was a consensual encounter versus the community caretaking exception. I think that's what the trial court. But it didn't mention that, what was the title of the motion? Motion to Quash Arrest and Suppress Evidence? I don't recall the trial court making any reference about the motion to quash arrest. Unless Your Honors have any other questions, the state asks that you affirm. Thank you. Thank you. Rebuttal? Your Honors, may it please the Court. I'd like to address what opposing counsel said about the audio. Officer Snow's vehicle was parked in the adjacent lot, so you have video from the start of the encounter, but no audio. And the audio only turns on right as Mr. Winchester's door is opened. I believe the first thing you hear is Officer Snow saying, don't get out, don't get out. So the entire preceding efforts to wake him up, Mr. Winchester's comments, none of that is recorded. And it's significant. Suddenly, as soon as the door is open, and Officer Snow is able to testify about some of the facts about Mr. Winchester's appearance and his breath, that's when he turns on the mic. That's when he says, I think I've got something. And up to that point, he testifies it was 30 seconds at trial. He doesn't mention how long it was in the motion to quash. And that's something I would just say is, it simply adds to... Were you suggesting he's not telling the truth? I'm suggesting that, like some of his other testimony, it was slightly embellished with the jury. At the motion to quash, he says, Mr. Winchester said no policia. At the trial, he says, he said, fuck you, no policia. At trial, he says, it appeared Mr. Winchester was trying to elude me. Was this argument made about the embellishment to the trial court? I'm sorry, was the argument made? Yeah, the argument you just made now. Was this presented to the trial court? No, I don't believe so. Well, can we consider it? I think it's evidence in the record. Yes, I think your argument is fair. In your brief, you argue that the vast majority of Snow's conduct was not undertaken with the goal of checking on his well-being. That's correct. The vast majority? It seems to me that the only argument you could make that wasn't would be when he's knocking on the window and saying, open the door. Up to that point, what's the basis for that statement? Respectfully, the vast majority of his conduct being from the moment he starts following Mr. Winchester up to parking in the parking lot, and he says, I intended to pull into the parking lot to turn around, but he doesn't explain why he decided not to. He just, no one ever asks him. It's never elicited on direct or cross. He just says, I wanted to turn around, and I did. Did he say he was watching the other cars? He was watching once he had parked, and he was waiting. There's no explanation given for why he stops in the first place. Well, he thought the guy was driving oddly. Didn't he say that? Well, to return to that, Your Honor, I still respectfully disagree that he was driving strangely. The only comment that we have is that he says he was leaned forward, and he was gripping the steering wheel and looking forward straight ahead. But this isn't a situation where he was following Mr. Winchester or driving. He described it as tunnel vision, didn't he, the officer? For that brief moment when they came across each other, not for the entire time that he was driving. Well, he didn't see him the entire time. For that brief moment, he thought this was unusual. Why is that not believable? It's not a question of believability, Your Honor. It's a question of whether it's reasonable to think that's cause for concern. Some people say that if you're driving on the highway, and you're following the speed limit, and you're driving very intently, those are the cars that ought to be stopped. Well, I would disagree with that, as there's no reasonable suspicion of that. Because they're transporting drugs or whatever, because those are the only people that obey the speed limit. Respectfully, Your Honor, I drive the speed limit. The motion to quash arrest, was there any discussion about the title of that? This Court has written about how that's a bogus motion that has oozed out of Cook County and infiltrated the practice downstate. I'm just wondering if there was some discussion. I don't believe so, Your Honor. I'm not familiar with having… The suggestion is that we've written in the past, maybe we need to do it again, that motions to quash arrest should be dismissed or denied on their face, handed back to defense counsel, and say, well, proper motion, counsel. I don't know that I can comment on that, Your Honor. Okay. I did also want to briefly address, the moment when Mr. Winchester wakes up, it's also important to note what Officer Snow didn't testify about, what he didn't say. And I'd compare that to Carlson, which is in our brief, where you have a similar situation, guy on the side of the road, officer wakes him up, and the guy immediately tries to light a cigarette that isn't there, that doesn't exist. And that's concerning. That's a little weird. There was nothing like that here. Well, he's got a bottle in one hand and his car keys in the other, slumped over, seemingly passed out, according to the officer. Why isn't that different than, let's say, if the keys were still someplace else? It looks like he's lost consciousness in that posture, doesn't it? Respectfully, no, because he was just asleep. How does the officer know that by looking at him? He's got a bottle, the keys, and he's slumped over. How does the officer know, looking at him, that he's asleep and not having lost consciousness? And further, according to the officer, he's knocking on the window, and if he's just asleep, why wouldn't he have responded more quickly? The officer says, 30 seconds. Well, respectfully, it doesn't matter what he knows subjectively. It's what's reasonable objectively. Okay, I'm looking at the situation through the officer's eyes. You're right. It's objective. How do I know, from what the officer said, that this guy is not unconscious, hasn't lost consciousness, as opposed to being asleep? Because it's not reasonable to think, in that exact moment, he lost consciousness. What do you mean, in that exact moment, as opposed to what? He'd driven for over a mile without any issues. Well, you see, that's where he said, no, this looked like the driving wasn't normal. That's where I went back to that. You're saying, oh, we could disregard that, too. I'm saying his driving wasn't abnormal. He was driving within the bounds of the law, which is really all that's required of him. Okay. I realize I'm out of time. May I briefly address the sentencing issue? No. Okay. I think it's been adequately briefed. Okay, fair enough. Thank you. In that case, I would ask Your Honors to reverse the judgment of the circuit court and remand Mr. Winchester's case for a new trial, or alternatively, a sentencing hearing. Thank you. It takes a matter of your advisement. We'll wait for the readiness of the next case.